**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

OHIO STATE TROOPERS ASSOCIATION, INC.,
INTERNATIONAL UNION OF POLICE
ASSOCIATIONS, TREVOR KOONTZ, RYAN
PURPURA, STEVEN ROHNER, ALEXANDER
PATER AND LANCE DESHUK

                  Plaintiffs,

vs.

POINT BLANK ENTERPRISES, INC.

                  Defendant.

_____/

CASE NO.

DEMAND FOR JURY TRIAL

**COMPLAINT – CLASS ACTION**

       Plaintiffs, Ohio State Troopers Association, Inc., the International Union of Police

Associations, Trooper Trevor Koontz, Sergeant Ryan Purpura, Trooper Steven "Eric" Rohner,

Trooper Alexander Pater, and Trooper Lance Deshuk (collectively "Plaintiffs" or "Named

Plaintiffs" and Koontz, Purpura, Rohner and Pater collectively "Individual Plaintiffs"),

individually and on behalf of all persons similarly situated, by their undersigned counsel,

pursuant to Rule 23, Fed.R.Civ.P., and Local Rule 23.1, file this Class Action Complaint against

defendant Point Blank Enterprises, Inc. and, in support hereof, allege upon personal knowledge

as to their own acts and status, and otherwise upon information and belief based upon the

investigation of counsel, as follows:

**INTRODUCTION**

       1.     Point Blank Enterprises, Inc. ("PBE" or "Defendant") is a manufacturer of law

enforcement protective products, including ballistic resistant soft body armor (commonly

referred to as bullet resistant vests) which PBE sells through various channels (directly, through

manufacturer sales representatives employed by PBE, or through authorized distributors and

1

representatives) to police officers and others all across the United States.  PBE manufactures

these products through wholly-owned subsidiaries and/or brand names, including, Point Blank

Body Armor, Inc. ("PBBA"), Protective Apparel Corporation of America ("PACA") Paraclete,

Protective Products Enterprises, and others.

2.      This action arises from the sale of defective PBBA and PACA *concealable* model

vests manufactured by PBE containing what Defendant touts in its marketing materials as a

proprietary and exclusive "Self-Suspending Ballistic System (SSBS)" feature ("SSBS Vests").

As described below, the SSBS Vests are represented and warranted to have certain qualities and

performance characteristics which, in fact, they do not have.  The SSBS Vests pose a life-

threatening safety issue and cannot be reasonably relied upon for their intended use.

3.      As a result of reported problems with the SSBS, certain states have barred sale of

SSBS Vests through state contracts, including Texas and the Commonwealth of Massachusetts.

4.      Defendant breached its express and implied warranties, and misrepresented and

omitted material facts regarding the quality, characteristics, suitability and safety of the SSBS

Vests.  Defendant has also concealed that the vests contain manufacturing defects that create an

imminent danger and risk of injury to the Individual Plaintiffs and others who use and depend

upon the vests, many of whom are law enforcement officers whose job it is to protect the public.[1]

---

[1] Defendant has a long history of selling defective ballistic vests, denying they have manufacturing
defects and affirmatively attempting to conceal the defects. Those actions resulted in several class
actions (including an investigation and suit by the United States under the False Claims Act, 31 U.S.
Code §§ 3729-3733) that resulted in the recall and replacement of tens of millions of dollars of vests
as well as a $1,000,000 settlement with the United States. *United States v. Point Blank Body Armor,
Inc., et al.*, Case No. 1:10-cv-01716 (D.D.C. 2010); *Southern States Police Benevolent Association,
Inc., et al. v. Point Blank Body Armor, Inc.*, CACE05000084 (Seventeenth Cir. Broward Co., Fla.);
*Jamie Norris, et al. v. Protective Apparel Corp. of America, et al.*, CACE05012961 (Seventeenth
Cir. Broward Co., Fla.); *Thomas Kiefer, et al. v. Protective Products International*, CACE05016039
(Seventeenth Cir. Broward Co., Fla.); *See also SEC v. Point Blank Solutions, Inc.*, Case No. 11-cv-
60431 (S.D. Fla 2011) (action by Regional Miami Office for "massive accounting fraud," for being

5.     The defects in the SSBS Vests manifest and are present when the vests exit the manufacturing line and cannot be detected by class members until the vests fail.  In addition to concealing the latent defects in the SSBS Vests, Defendant has knowingly and affirmatively publicized false and misleading information about the effectiveness and durability of the SSBS to induce sales, has refused to notify any purchasers of the defects and has refused to recall them. All conditions precedent to bringing this action have been satisfied or waived.

## THE PARTIES

**Plaintiffs**

6.     Plaintiff Ohio State Troopers Association, Inc. ("OSTA") is a membership organization whose members are Ohio State Highway Patrol Troopers ("Troopers") and others. OSTA exists to protect and advance the interests and safety of its membership and is the sole and exclusive bargaining agent for approximately 1,800 Troopers (including the Individual Plaintiffs) as well as sergeants, dispatchers, and others.  During the past five years male and female OSTA members have purchased approximately two hundred SSBS Vests in all models sold by Defendant.  OSTA has directly incurred financial loss in time and money, including purchasing and providing replacement vests for the defective SSBS Vests when PBE refused to do so. OSTA has also been actively involved in every step of this matter on behalf of its members that purchased SSBS Vests, at substantial time and expense, including its management working with counsel prefiling to gather facts and evaluate claims, assisting in locating used SSBS Vests for laboratory testing, working with counsel to discuss confidential pre-suit settlement communications between the parties and more.  Additionally, OSTA has been involved in extensive litigation discovery prior to this filing, including gathering and producing documents

---

"willfully blind to numerous red flags" and for issuing "materially false and misleading periodic reports" to investors and others.); https://www.sec.gov/news/press/2011/2011-52.htm.

and giving a deposition. OSTA's obligations for Trooper safety directly invoked its involvement because, among other reasons, there is a mandatory "wear policy" for all Troopers, requiring them to wear bullet resistant vests at all times, and the SSBS Vests are defective and cause a safety risk.

7.      OSTA is a Plaintiff for purposes of injunctive relief sought in the Third Claim for Relief.  Separate and apart from it seeking notice of the *safety* issue caused by the defects in the SSBS Vests, OSTA also seeks injunctive relief to prevent its members from continuing to be *financially* harmed by Defendant's deceptive and unfair business practices.  OSTA's members are required to obtain new vests every five years.  Absent injunctive relief, OSTA members, including new and other members, have and will continue to purchase SSBS Vests, unaware of their true qualities, characteristics and defects.

8.      Plaintiff International Union of Police Associations ("IUPA") is organized and licensed in the State of Florida and maintains its headquarters in Sarasota, Florida.  Founded in 1966, it is the only AFL-CIO union chartered exclusively for law enforcement and law enforcement support personnel.  IUPA's membership of thousands of active and retired law enforcement officers fight to improve the lives of their brothers and sisters in law enforcement. IUPA also works to improve legislation that protects and affects public safety officers, as well as representing the needs of law enforcement officers and support personnel, whether that be for safe and better equipment, more staff or a fair wage.  The prime directive for any law enforcement entity, whether it be a department, agency, or a labor union representing officers, is officer safety.  For decades IUPA has been involved in working with body armor manufacturers, including Point Blank, to address safety issues relating to ballistic vests.  Doing so is part of its core function and is germane to the organization's purpose.  Many of IUPA's members,

including members in Florida, have a mandatory "wear policy" requiring them to wear bullet resistant vests at all times on every shift.  IUPA has directly incurred financial loss in time and money in connection with the unacceptable safety risks the defective SSBS Vests resulting to its members, including through significant time and efforts in assisting to bring the SSBS Vest failures to light, pre and post litigation.   IUPA has been actively involved, at material time and expense, in every step of this litigation, including its management working with counsel prefiling to gather facts and evaluate claims, assisting in locating used SSBS vests in Florida for laboratory testing, working with counsel to discuss confidential pre-suit settlement communications between the parties and more.  IUPA has also been involved in extensive litigation discovery prior to this filing, including gathering and producing documents and giving a deposition.  IUPA's membership spans twenty-six states and the Virgin Islands.  Male and female members of IUPA across the country, including in Florida, have purchased thousands of SSBS Vests in all models, and have standing to bring individual claims as set forth herein against Defendant.  More specifically and with respect to Florida for example, more than a dozen IUPA member agencies, as well as individual members, have purchased more than one thousand SSBS Vests in all models, including Broward County Sheriff's Office, North Miami Police Department, Key Biscayne Police Department, Clermont Police Department, Sarasota Sheriff's Office, Volusia County Sheriff's Office, Port St. Lucie Police Department and more.  Members of IUPA, including in Florida, have experienced failure of the SSBS in their vests.

9.     IUPA is a Plaintiff for purposes of injunctive relief sought in the Third Claim for Relief.  Separate and apart from notice of the *safety* issue caused by the defects in the SSBS Vests, IUPA also seeks injunctive relief to prevent its members from continuing to be *financially* harmed by Defendant's deceptive and unfair business practices.  IUPA's members are required

to obtain new vests every five years.  Absent injunctive relief, IUPA members throughout the country, including new and other members, have and will continue to purchase SSBS Vests, unaware of their true qualities, characteristics and defects.

10.     Plaintiff Trevor Koontz is a citizen of the State of Ohio.  He has served as a Trooper in the Ohio State Highway Patrol for the past six years.

11.     In November, 2012 Trooper Koontz had an in-person sales meeting with a PBE sales representative and an authorized PBE distributor (believed to be Dan Wheeler) where he selected a new Point Blank Vision (SP+2LE) vest (a SSBS Vest) for purchase.

12.     Defendant never disclosed any limitations on the use of the SSBS, any defects or any of the problems with the SSBS raised in this suit at any time, including in any of its marketing materials or otherwise.

13.     Had Defendant disclosed that the vest had a defective SSBS, or that he would continually experience the SSBS falling apart in the line of duty, Trooper Koontz would not have purchased the vest.

14.     Trooper Koontz reasonably expected that Defendant would stand behind its products and the SSBS for the five-year warranties and would not have purchased it had he known Defendant would not do so.

15.     The vest was manufactured at PBE's facility in Pompano Beach, Florida on or about December 11, 2012.  It was later shipped by PBE directly from Pompano Beach to Trooper Koontz and paid for and purchased by Trooper Koontz. The vest was not received by Trooper Koontz until after Christmas or New Year's.

16.     PBE provided five-year express warranties to Trooper Koontz for his SSBS Vest, including on the SSBS.

17.     The vest has manufacturing and material defects, is defective in design and is otherwise defective.  It has fallen apart (including in the line of duty while Trooper Koontz was on foot patrol at the Republican National Convention in Cleveland in 2016) and poses a life-threatening safety issue.

18.     Trooper Koontz notified and corresponded directly with PBE at its corporate headquarters in Pompano Beach, Florida, in writing and by telephone numerous times between July and November 2016 (and subsequently through counsel) about the defects in his Vision SSBS Vest and requested PBE to promptly honor its warranties and replace the vest.   Customer service told Trooper Koontz that PBE was unaware of any issue or complaints about the SSBS.  Through counsel, Trooper Koontz further informed PBE that it is mandatory for him and all other Troopers to wear their bullet resistant vests whenever on duty.  PBE refused to properly address and honor its warranties and replace the defective vest with a properly functioning, safe vest.  Rather, Defendant sent Trooper Koontz a new set of shoulder straps (the first two sets had already failed) and carrier.

19.     A new carrier and new shoulder straps did not and cannot correct the defects with his or any other SSBS Vest.  Trooper Koontz was forced to use duct tape while on duty to prevent his vest from falling apart because of the SSBS failure.

20.     Trooper Koontz is a plaintiff for Counts 1 and 2 below.

21.     Plaintiff Steven Eric Rohner is a citizen of the State of Ohio.  He has served as a Trooper in the Ohio State Highway Patrol for seventeen years.  Trooper Rohner is assigned to the statehouse post which includes the Ohio Supreme Court, the Ohio House of Representatives and Senate, and the Governor's offices.

22.     Trooper Rohner selected a Point Blank Elite (AXII) model vest (a SSBS Vest) for purchase through an in-person sales meeting with a PBE sales representative and authorized PBE distributor in April, 2015.  Prior to purchase, Trooper Rohner also researched online, including on PBE's website, about the vest and was exposed to some of Point Blank's marketing materials.

23.     Defendant never disclosed any limitations on the use of the SSBS, any defects or any of the problems with the SSBS raised in this suit at any time, including in any of its marketing materials or otherwise.

24.     Had those website materials or Defendant disclosed that the vest had a defective SSBS, or that he would continually experience the SSBS falling apart in the line of duty, he would not have purchased the vest.

25.     Trooper Rohner reasonably expected that Defendant would stand behind its products and the SSBS for the five-year warranties and would not have purchased the vest had he known Defendant would not do so.

26.     The vest was manufactured at PBE's facility in Pompano Beach, Florida on or about May 8, 2015.  It was later shipped by PBE directly from Pompano Beach to Trooper Rohner and paid for and purchased by Trooper Rohner.  Trooper Rohner paid $712.09 for the vest.  He subsequently received the vest on or about May 18, 2015.

27.     PBE provided five-year express warranties to Trooper Rohner for his SSBS Vest, including on the SSBS.

28.     The vest has manufacturing and material defects, is defective in design and is otherwise defective.  It has fallen apart (including while in the line of duty and with a new, second set of SSBS straps) and poses a life-threatening safety issue.

29.     Trooper Rohner, through counsel, notified and corresponded with PBE and its

counsel in writing, by telephone numerous times, at an in-person meeting in Florida on April 26, 2017 and afterwards about the breaches of warranties, defects, and failures in the field of his Elite SSBS Vest, including informing Defendant that he and other Troopers were experiencing the failures as early as within the first year, and that new replacement shoulder straps do not fix the problem.  Trooper Rohner, through counsel, additionally informed Defendant that when the failure occurs in the line of duty he needs to stop what he is doing, find a safe place, remove his uniform and attempt to reattach the SSBS connections in the field.  As a result, he was forced to use electrical tape while on duty to prevent the vest from coming apart and falling down because of the SSBS failure.  Through counsel, he further informed Defendant that it is mandatory for him and all other Troopers to wear their bullet resistant vests whenever on duty.

30.     Plaintiff Ryan Purpura is a citizen of the State of Ohio.  He is a Sergeant in the Ohio Highway Patrol where he has served for the past thirteen years.  He is also a C-130 Pilot in the Air Force Reserves, having previously served in the Air Force.

31.     Sergeant Purpura selected a Point Blank Elite (AXII) model vest (a SSBS Vest) for purchase through an in-person meeting in February, 2015 with a PBE sales representative and an authorized PBE distributor.  Prior to purchase, Sergeant Purpura also researched online, including on PBE's website, about the vest and was exposed to some of Point Blank's marketing materials.

32.     Defendant never disclosed any limitations on the use of the SSBS, any defects or any of the problems with the SSBS raised in this suit at any time, including in its marketing material or otherwise.

33.     Had those website and marketing materials, or Defendant disclosed that the vest had a defective SSBS, or that he would continually experience the SSBS falling apart in the line

of duty, he would not have purchased the vest.

34.     Sergeant Purpura reasonably expected that Defendant would stand behind its products and the SSBS for the five-year warranties and would not have purchased the vest had he known Defendant would not do so.

35.     The vest was manufactured at PBE's facility in Pompano Beach, Florida on or about March 9, 2015.  The vest was later shipped by PBE directly from Pompano Beach to Sergeant Purpura and paid for and purchased by Sergeant Purpura.  He paid $727.40 for the vest. He subsequently received the vest on or about March 23, 2015.

36.     PBE provided five-year express warranties to Sergeant Purpura for his SSBS Vest, including on the SSBS.

37.     The vest has manufacturing and material defects, is defective in design and is otherwise defective.  The SSBS has repeatedly fallen apart and failed in the line of duty (including with a new second set of SSBS straps).  When the failure occurs in the line of duty he needs to stop what he is doing, find a safe place, remove his uniform and attempt to reattach the SSBS connections.  The vest poses a life-threatening safety issue.  More specifics as to the failures of Sergeant Purpura's vest and the other Individual Plaintiffs' vests are discussed below.

38.     Through counsel, Sergeant Purpura notified and corresponded with PBE representatives and its counsel in writing, by telephone numerous times, at an in-person meeting in Florida on April 26, 2017 and afterwards about the breaches of warranties and defects in his SSBS Vest and that new replacement shoulder straps do not fix the problem.  Through counsel, he further informed PBE that it is mandatory for him and all other Troopers to wear their bullet resistant vests whenever on duty.  Additionally, Defendant was provided a draft complaint on March 30, 2017.

10

39.     Plaintiff Alexander Pater is a citizen of the State of Ohio.  He is a Trooper in the Ohio Highway Patrol assigned to the Cincinnati Metro Post where he has served for the past four years.  Prior to that he was a Corporal in the Marine Corps and Combat Engineer responsible for, among other things, clearing mines.

40.     Trooper Pater selected a Point Blank Vision (IIIA) model SSBS Vest for purchase through an in-person sales meeting with a PBE sales representative and an authorized PBE distributor.

41.     Defendant never disclosed any limitations on the use of the SSBS, any defects or any of the problems with the SSBS raised in this suit at any time, including in any of its marketing materials or otherwise.

42.     Had Defendant disclosed that the vest had a defective SSBS, or that he would continually experience the SSBS falling apart in the line of duty, Trooper Pater would not have purchased the vest.

43.     Trooper Pater reasonably expected that Defendant would stand behind its products and the SSBS for the five-year warranties and would not have purchased the vest had he known Defendant would not do so.

44.     The vest was manufactured at PBE's facility in Pompano Beach, Florida on or about May 16, 2014.  It was later shipped by PBE directly from Pompano Beach to Trooper Pater and purchased and paid for by Trooper Pater.  The vest was subsequently received at the end of May or in early June, 2014.

45.     PBE provided five-year express warranties to Trooper Pater for his SSBS Vest, including on the SSBS.

46.     The vest has manufacturing and material defects, is defective in design and is

otherwise defective.  The SSBS repeatedly fell apart and failed, including in the line of duty.
When the failure occurred, he needed to stop what he was doing, find a safe place, remove his
uniform and attempt to reattach the SSBS connections.  The SSBS in the vest has completely
failed (including with a new second set of SSBS straps) and posed a life-threatening safety issue.
As a result, he was forced to use safety pins or other stop gap measures while on duty to prevent
the vest from coming apart and falling down because of the SSBS failure.   More specifics as to
the failures of Trooper Pater's vest and the other Individual Plaintiffs' vests are included below.

47.     PBE representatives were notified about the breaches of warranty and defects in
his SSBS Vest as early as April, 2017, and, through counsel, Trooper Pater subsequently
provided additional information and notification of the failure of his vest to PBE, including
photographs of the failed SSBS connection.  PBE was separately notified of the failure of the
SSBS in Trooper Pater's vest and PBE's breaches of warranty, in July, 2018.  Through counsel,
Trooper Pater further informed PBE that it is mandatory for him and all other Troopers to wear
their bullet resistant vests whenever on duty.

48.     Plaintiff Lance Deshuk is a citizen of the State of Ohio.  He has served as a
Trooper in the Ohio State Highway Patrol for seventeen years.  Trooper Deshuk is assigned to
the North Ridgeville post.

49.     Trooper Deshuk selected a Point Blank HiLite (II) model vest (a SSBS Vest) for
purchase through an in-person sales meeting with a PBE sales representative and authorized PBE
distributor who came to his post in the summer of 2015.  Prior to purchase, Trooper Deshuk also
researched online, including on PBE's website, about the vest and was exposed to some of Point
Blank's marketing materials.

50.     Defendant never disclosed any limitations on the use of the SSBS, any defects or

any of the problems with the SSBS raised in this suit at any time, including in any of its marketing materials or otherwise.

51.     Had those marketing materials or Defendant disclosed to Trooper Deshuk that the vest had a defective SSBS, or that he would continually experience the SSBS falling apart in the line of duty, he would not have purchased the vest.

52.     Trooper Deshuk reasonably expected that Defendant would stand behind its products and the SSBS for the five-year warranties of the vest and would not have purchased it had he known Defendant would not do so.  The vest was manufactured at PBE's facility in Pompano Beach, Florida on or about September 15, 2015.  It was later shipped by PBE directly from Pompano Beach to Trooper Deshuk and paid for and purchased by Trooper Deshuk.  The vest was subsequently received on or about September 23, 2015.

53.     PBE provided five-year express warranties to Trooper Deshuk for his SSBS Vest, including for the SSBS.

54.     The vest has manufacturing and material defects, is defective in design and is otherwise defective.  Within approximately six to eight months the SSBS failed.  He contacted a PBE authorized representative and was provided another set of shoulder straps. The SSBS again began to fail within approximately another six to eight months.  He again contacted the Point Blank authorized representative and informed him that the SSBS had fallen apart, and that his side straps were also failing.  The representative again provided another set of SSBS straps and a new carrier.  The third set of SSBS straps have again failed.  His vest has fallen apart (including while in the line of duty) and poses a life-threatening safety issue.

55.     Defendant has been notified several times about the beaches of warranty and defects in Trooper Deshuk's vest and those of all other OSTA members, including having been

provided a draft copy of a complaint as early as April, 2017 and afterwards.  When the failures occur, Trooper Deshuk has to get off the road or otherwise remove himself from his duties, find a safe place, remove his uniform and attempt to reattach the SSBS connections in the field.  He is required to wear his vest on every shift.

56.     As discussed more fully below, the SSBS Vests worn by Trooper Koontz, Trooper Rohner and Sergeant Purpura were laboratory tested and had less than five pounds of connectivity tensile strength (decreased approximately 90% from new) and could not even support the vest weight and movement necessary to don or doff the vests.

**Defendant**

57.     PBE is a corporation organized under the laws of the State of Florida, maintaining its principal office and manufacturing facility at 2102 SW 2nd Street, Pompano Beach, Florida 33069.  Its registered agent for service is CT Corporation System**,** 1200 South Pine Island Road, Plantation, Florida 33324.

58.     Although Defendant has operated under different names at various times, PBE advertises and represents to all purchasers of its products, including SSBS Vests, that it has continuously been in business as the same company manufacturing body armor "since 1973."

**JURISDICTION AND VENUE**

59.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).  The matter in controversy, exclusive of interest and costs, exceeds $5,000,000 and is a class action with more than 100 class members, many of whom are citizens of a state different from Defendant.  28 U.S.C. § 1332(d)(3) is inapplicable here.  The vests that are the subject of this litigation were sold throughout the United States and the percentage sold in Florida is not greater than one-third of the total nationwide sales.

60.     The precise number of SSBS Vests sold during the relevant time period, the identity of each purchaser, the organization or entity (where applicable) to which each purchaser is associated, the date of purchase, the location of purchase, the model SSBS Vest purchased, the serial numbers of the ballistic panels, the date of manufacture, the dates of issuance and invoicing, the address where Defendant shipped each vest, the exact price Defendant received for each vest and more is all readily shown in Defendant's sales databases.

61.     This Court has personal jurisdiction over Defendant because it is a Florida corporation, maintains its principal place of business in the State of Florida, breached warranties and engaged in the acts, omissions and other conduct alleged herein in the State of Florida.

62.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (b) because Defendant's principal place of business is located in this judicial district and the substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## TOLLING OF STATUTE OF LIMITATIONS

63.     The original complaint in this matter was filed on October 19, 2017.  The Court's Order denying class certification without prejudice was entered on October 29, 2018.  The statute of limitations for all claims of all putative class members was tolled during that time period.

## EVENTS GIVING RISE TO THE CLAIMS

**The SSBS Vests**

64.     Bullet resistant vests typically contain two primary components: (1) the ballistic panel system; and (2) the carrier or outer garment in which the ballistic panel system is placed.

65.     Traditionally, body armor manufacturers do not tamper with the integrity of the ballistic panels by incorporating attachments or a "suspension system" into the ballistic panel system.  Rather, any straps or suspension system is incorporated into the carrier, including any Velcro or other similar material.  In the typical configuration, if the Velcro, or for that matter,

15

any other component of the outer carrier wears out, purchasers can simply order a new carrier and change out the ballistic panels from the old carrier to the new carrier in a few minutes.

66.     In an SSBS Vest, the ballistic panel system includes the SSBS.  PBE advertises the SSBS as part of the "ballistic system" (self-suspending *ballistic system*) that features several components that form and are integrated into the ballistic panels.  Those components include shoulder straps that connect to a Velcro-like material sewn directly into the ballistic panels.  The carrier then covers the ballistic panel system, but, unlike in a typical vest, the carrier for an SSBS Vest does not have its own shoulder straps or other suspension system to hold it in place when being worn.  In the SSBS Vests, that "suspension system" is directly incorporated into the ballistic panels.  Indeed, the SSBS is directly stitched and tethered to the ballistic fabric.

67.     Figures 1, 2 and 3 below show the ballistic panel system of an SSBS Vest, without the carrier, showing parts of the SSBS including the Velcro-like half circle c-clamps (sometimes called a bird's mouth or gator mouth) sewn into the top of the ballistic panels and the straps that connect the front ballistic panel to the back ballistic panel (both panels and the SSBS form the overall ballistic panel system).  Figure 1 is a single ballistic panel from an SSBS Vest with the sewn-in Velcro-like c-clamps at the top into which the straps are inserted.   Figure 2 is a close up of one of the c-clamps. Figure 3 shows an entire ballistic panel system of an SSBS Vest.



FIGURE 1

16



FIGURE 2



FIGURE 3

68.     Figures 4 and 5 below show the differences between the carrier for a SSBS Vest and the carrier of a traditional vest.  Figure 4 shows the carrier of a SSBS Vest, which consists of the front and back coverings for the ballistic panel system plus the waist straps (no shoulder strapping system).  As shown, the SSBS is not part of the carrier.  Carriers are sold by PBE *separately* and do not come with any SSBS component such as the shoulder straps.  Figure 5 shows an industry standard carrier where the shoulder straps are part and parcel of the carrier, not the ballistic panels.  With the industry standard design, if either shoulder strap fails for any reason, the ballistic panels can simply be removed from the inner pouches of the old carrier that hold the panels and inserted into the pouches of a new replacement carrier.  Unlike with SSBS Vests, this can be done by an officer without having to return the vest to the manufacturer (which means the officer is not without a vest and violating any mandatory wear policy).



FIGURE 4

18



FIGURE 5

69.     Five years is the typical useful life for ballistic panel systems in concealable vests and the industry-standard warranty period, while the carriers are typically warranted for 2 years. The ballistic panel systems can be removed from the carrier of most concealable vests so that a carrier can be dry cleaned or otherwise washed.  It is not uncommon for a carrier to become stained, sweat-soaked or wear out and be replaced one or more times during the five-year useful life and warranty period of the ballistic panel system.

70.     PBE supplies five-year written warranties (discussed more fully below) covering the SSBS and ballistic panel system, and a separate two-year written warranty for the carriers of its SSBS Vests.

71.     Defendant has manufactured and sold hundreds of thousands of SSBS Vests during the relevant time period for use by police officers and others at prices in the average range of $700.

72.     Substantially all of the acts and omissions alleged herein emanated from and were controlled by Defendant from its facilities located at 2102 SW 2nd Street, Pompano Beach, Florida 33069, including the design, manufacture, marketing, and distribution of the SSBS Vests.

73.     Defendant at all times relevant to matters herein, tightly controlled all aspects of the design, manufacture, marketing, distribution, and labeling of the subject SSBS Vests.

74.     At all relevant times, the SSBS Vests were only sold directly by PBE or through PBE-authorized distributors and representatives, and Defendant's marketing materials and sales information on SSBS Vests, including those to which Plaintiffs were exposed, were uniform.

**The SSBS Is Defective In Manufacture, Materials, Workmanship and Design**

75.     Each SSBS Vest manufactured by PBE, regardless of the make, model, or threat level, includes the same SSBS described herein and suffers from the same latent defects.

76.     The defects in the SSBS Vests exist from the time the SSBS Vests leave the manufacturing line, in that the SSBS will fail when repeatedly used by officers while donning and doffing their SSBS Vests and/or from use over time even if the SSBS is not cycled daily.

77.     The SSBS Vests of all Individual Plaintiffs have failed and fallen apart in the line of duty.  As a result, the vests could not continue to be worn and the Individual Plaintiffs were forced to use self-help band-aid measures and obtain new replacement vests.

78.     Repeated disengagement of the SSBS straps from the c-clamps, whether by peeling or shearing, weakens the SSBS closure to a point where it does not have sufficient strength to securely support the weight of the vest on an officer.

79.     The SSBS Vests unexpectedly fall apart in the line of duty when movement causes the SSBS to fail and the ballistic panels to separate from the shoulder straps.  When that happens, for example, the ballistic panel sinks down inside the user's uniform and cannot be worn.  The user then needs to stop whatever he or she is doing, find a safe place, remove their uniform and find some way to hold the vest in place other than the failed SSBS.

80.     At all pertinent times, Defendant was and continues to manufacture, distribute,

advertise, market, and sell SSBS Vests for the intended purpose of protecting the lives of those who wear them.

81.     At all pertinent times, Defendant has represented and advertised that a normal and customary manner of donning and doffing the SSBS Vests is by disconnecting the SSBS.

82.     Defendant further represented and advertised that disconnecting the SSBS to don and doff the vests was not only normal and appropriate, but that doing so was a "preferred" and "easy" method of donning and doffing its SSBS Vests and that officers, in particular females, often disconnect "one of the shoulder straps and remove the armor and carrier like a buttoned shirt - yes, to avoid dragging the armor over their face and hair."

83.     Despite those representations and advertisements, and unbeknownst to any purchasers, internally, Defendant's management has stated that the vests are not robust enough for that purpose.  Defendant's representations and active concealment of that information is deceptive and unfair.

84.     At all relevant time periods, Defendant also posted a training video on its website demonstrating that the normal and appropriate method to disconnect the SSBS is by pulling or shearing, or a combination of pulling/shearing and peeling the SSBS connection apart.

85.     *Defendant knows and has documents showing that doing so will cause severe and rapid deterioration and failure of the SSBS, and has actively concealed that information from all purchasers.*  Concealing that information is deceptive and unfair.

86.     At all relevant times, Defendant was aware that purchasers would shear the SSBS connection to disengage it, and indeed, its own customer/officer witnesses have testified that they "grab the strap," "pull it off" and shear rather than peel the SSBS, to disconnect it.

87.     Furthermore, Defendant's management has acknowledged that the company has

never Informed purchasers to not pull apart or shear the SSBS connection.

88.     In addition to the failures of the hook and loop of the SSBS, during all relevant time periods Defendant has experienced complete failure of the stitching in the SSBS, many times as early as *within a few months of use,* because of substandard materials, workmanship and stitching methods, and design. These defects result in the entirety of the c-clamp portion of the SSBS separating from the ballistic panels in the vests.

89.     This is not the first time Defendant has had reported problems with the SSBS, a system it warrants to be "highly effective" but in truth unexpectedly falls apart. Defendant first manufactured and sold a model vest with an SSBS type system in the mid-2000s.  Defendant later expanded the SSBS into additional model vests.

90.     Early on, the SSBS models used elastic shoulder straps.  Users reported problems with those SSBS models, including that the elastic permanently stretched and resulted in failure of proper ballistic coverage, fit, and other associated problems.  As a result, Defendant switched to more robust, higher quality and higher-cost components of the SSBS that provided better connectivity, including larger and longer genuine Velcro "hook" clamps sewn in the ballistic panels, as well as thicker, elastic and edge-stitched shoulders straps. The straps were made in-house by PBE and had real counterpart "loop" Velcro.  Figure 6 below shows an example:



FIGURE 6

22

91.     To lower costs and to shed weight so that it could advertise its vests as "lower profile" and among the lightest and thinnest in the marketplace, Defendant shortly thereafter jettisoned the higher quality more robust components and switched to less expensive, lower quality materials for the SSBS components, including using outsourced Breathe-O-Prene straps as part of its SSBS that do not have the traditional counterpart "loop" to connect to the "hook" connection tabs sewn into the ballistic panels.

92.     Defendant also reduced the amount of material used in the SSBS components, including reducing the size and length of the square Velcro connection clamps (shown in Figure 6 above) to the current smaller rounded c-clamps (shown in Figures 2 and 8) used at all relevant times hereto.

93.     Reducing the size and surface coverage of the "hook" Velcro portion of the SSBS sewn into the ballistic panels exacerbates the problems by decreasing the peel and shear strength of the connections and thus, increases the likelihood and immediacy of failure of the SSBS.

94.     In further efforts to reduce costs and shed more weight, Defendant later reduced the thickness, density, and amount of Breathe-O-Prene in the SSBS straps.

95.     Sacrificing officer safety for profit still further, Defendant then ceased using genuine Velcro and genuine Breathe-O-Prene, switching instead to knock-off versions from China at less than half the cost.  As a result of these cost-saving and marketing measures, Defendant has experienced reported failures of the SSBS in its SSBS Vests.

96.     But, and at all relevant times through this filing, Defendant has advertised that it is using genuine Velcro for the c-clamps and genuine Breathe-O-Prene for the SSBS when in fact it does not.[2]  Those advertisements are knowingly false.  Defendant's management has

---

[2] Breathe-O-Prene is a registered trademark of Accumed Corp.

testified they are false, that "it's definitely not Breathe-O-Prene" and that it never disclosed the truth to purchasers (including its largest customers - federal, state and local law enforcement departments) that the vests contain a Chinese-made imitation product.  Defendant's conduct in this regard was deceptive and unfair.

97.     Defendant's SSBS Vests at issue in this litigation contain cheap lower-cost and lower-quality components that are failing, including Chinese imitation Velcro "hook" clamps sewn in the ballistic panels that are too small, and Chinese imitation Velcro "loop" straps.

98.     PBE knows this premature failure of the SSBS connections should never happen and, in fact, represents in its marketing materials to all purchasers that "all armor materials should be robust enough to handle different wear and climate conditions."  Defendant's marketing materials also uniformly warrant for all SSBS Vests that the SSBS should last "throughout the life of the vest."[3]   At all relevant times, PBE had extensive knowledge of this defect from its own studies and surveys, from reports from its own research and design personnel, from the severity and consistency of the problems reported from its field representatives, from consistent complaints from purchasers (including repeat complaints from purchasers) and otherwise.  PBE was unable to fix this defect, does not have a permanent in-warranty fix, has never disclosed to purchasers that it knew this to be a *priority* problem and was unable to provide a permanent in-warranty fix.

99.     The SSBS contains defects in material and workmanship, is defectively designed, fails, and results in SSBS Vests posing a life-threatening safety risk to end users.

---

[3] The manner in which purchasers care and store their vests has nothing to do with the latent defects and resulting SSBS failures, and Defendant has represented that all of its materials should be "robust enough" to handle different user conditions. Additionally, as discussed below, any after-the-fact disclaimers as to care and storage are inapplicable to all purchaser here.

100. Defendant has knowingly manufactured and sold the SSBS Vests with the defective SSBS, while willfully concealing the true inferior quality, sub-standard performance and other defects causing failure of the SSBS.

101. Defendant has failed to notify the Individual Plaintiffs and any class members of the defects prior to their purchase of SSBS Vests.

**Vests That Cannot Be Properly Worn Create a Critical Safety Risk**

102. When SSBS Vests fail they cannot be worn without replacement or self-help measures such as duct tape, safety pins, etc.

103. Both the National Institute of Justice ("NIJ") and Defendant publicly state that a vest cannot protect an officer's life if it cannot be properly worn.

104. In fact, Defendant warns in the Care and Maintenance Manual provided to every purchaser (after the sale in the box shipping the vests) that the vest "can help reduce the risk *of fatal injury* only if you wear it."  (emphasis added).

105. Defendant further represents to all purchasers in the Care and Maintenance Manual that if the panels do "not stay in position" they must be replaced (not sent in for repair, not duct taped, but "replaced"). The SSBS vest, "*has to be worn properly* in order for it to function as designed… make sure that the ballistic panels *are in the proper position* within the carrier and that the *suspension straps are properly engaged*.  Armor that… *does not stay in position* within the outershell, *should be replaced*."  (emphasis added).

106. Here, the ballistic panels do not stay in "proper position" and the straps do not stay "properly engaged" because the SSBS Vests suffer from defects in design, material and workmanship wherein the SSBS prematurely fails.

107. Compounding the problem, even where repairs are attempted (as opposed to

replacement as recommended by PBE but which PBE refuses to honor), there is no method to repair a failed SSBS in the field.

108.    Equally problematic and further highlighting the failure of essential purpose /futility of attempted repairs, PBE's standard repair time is between two weeks and one month.

109.    However, the overwhelmingly majority of law enforcement agencies in the United States (and all agencies that accept federal funds) have a mandatory wear policy and thus, officers may not go on a single shift without their vests, let alone weeks on end.

110.    Consequently, the majority of purchasers that have experienced failures of the SSBS turn to, and continue to be forced to turn to, self-help methods, including duct tape, electrical tape, safety pins and other methods to hold their vests together and address the safety issue from the SSBS failure.  Figures 7, 8 and 9 below show a few examples.



FIGURE 7                                                        FIGURE 8



FIGURE 9

111.    Any disclaimers as to alteration and modification of a vest are of no legal effect here.  Any such language in the Care and Maintenance Manual was not provided until *after* the sale of every SSBS Vest and until after the SSBS Vests were received.

112.    The same applies to any attempt to use language in the manual to disclaim warranties because of how purchasers cared for and stored their vests.

113.    Defendant's attempted disclaimers were provided to Plaintiffs and class members for the first time after the sale, and as a result, they are not binding.

114.    And, use of duct tape to support the SSBS connection is not an "alteration" or "modification" of the vest, but rather a "band-aid" or "stop-gap" measure.  Merriam-Webster's Unabridged Dictionary defines "alter" as "to make different in some particular, as size, style, course, or the like; modify."  "Modify" is defined as "to change somewhat the form or qualities of."  The form, size, style and qualities are not in any way changed by duct tape. The defective qualities remain what they are.  The definition of "band-aid" is "a makeshift, limited or temporary aid or solution." Similarly, the definition is "stop-gap" is "temporary substitute, makeshift."

27

**Laboratory Testing of New and Used SSBS Vests**

115.    Laboratory test data on *new and used* SSBS Vests performed at Clemson

University's Department of Materials Science and Engineering confirms that the SSBS will not

properly perform and maintain its integrity for its warranty period.  The laboratory test data

results confirmed that if a new SSBS Vest is donned and doffed by either shearing or peeling the

SSBS closure, the strapping system weakens to a point where the closure does not have sufficient

strength to securely support the weight of the vest on an officer.

116.    The raw data shows the problem is exacerbated by the presence of moisture

(simulated sweat solution) where the initial and subsequent strength results are reduced

significantly compared to ambient, dry conditions.

117.    The unembellished raw test data also confirm a substantial drop-off in

performance over just 100 *shear* tests (5 months of donning and doffing using a minimum of

only once per day, five days a week) losing over 85% of initial shear strength.

118.    Given that the weight of SSBS Vests are approximately 5 pounds, once

the shear strength drops to this level, after approximately 75 shear tests, the closure is at failure,

will not support the weight of the vest and will not keep it from falling down at the connection.

119.    Similarly, the test data results confirm a substantial drop-off in performance over

just 50 *peel* tests per side of the SSBS closure system (approximately 2.5 months of donning and

doffing by disconnecting the SSBS using a minimum of only once per day, five days a week)

losing approximately 50% of initial peel strength.

120.    The laboratory data starkly contrasts with what Defendant's engineers

acknowledge should be the performance capability of the SSBS (but that Defendant has

concealed from purchasers) – that purchasers should be able to cycle the SSBS connection twice

a day for five years.

121.    One of the mechanisms of the failure is shown by the following microphotographs in Figures 10 and 11.  Upon repeated disassembly and assembly, the plastic-like *hook* material in the SSBS clamps pulls out one end of *loop* fibers from the matrix (there is only a very thin layer of loop on an SSBS strap).  In doing so, the loop is not available to engage the hook (prevent it from just sliding off one end) upon the next closure.  As shown below in Figure 11, the loops are generally broken from the matrix and visibly appear straightened.



FIGURE 10                                      FIGURE 11

122.    Furthermore, the laboratory test data, including the test data on used vests, shows that the SSBS will prematurely deteriorate and is prone to fail within the warranty period even if the SSBS closure *is not* engaged and disengaged daily to don and doff the vests (*i.e.* the vests are donned and doffed by lifting them overhead), and only disengaged and engaged occasionally so that the carrier can be removed and laundered.   Put differently, the normal constant and daily tension and tugging placed on the SSBS closure over the useful life of the vest can and does cause it to fail.

123.    In fact, none of the Individual Plaintiffs donned or doffed their vests by engaging

29

and disengaging the SSBS daily. Rather, they donned and doffed their vests over their heads without disconnecting the SSBS and the SSBS in each of their vests still failed well within the five year warranty (and as early as approximately 1 year).

124.    PBE has long known that the SSBS prematurely deteriorates, with or without repeated disengagement of the SSBS closure, and has concealed internal documents showing same, including regular and consistent complaints from officers all across the country.

125.    PBE has also concealed from all purchasers internal documents detailing the normal and expected cycling (repeat daily disconnecting and reconnecting) of the SSBS the company expected during the five-year warranty period of the SSBS.

126.    PBE knowingly fails to disclose the fact that its SSBS Vests suffer from serious latent manufacturing, material and workmanship defects, namely that the SSBS connection holding the vest in place fails unexpectedly, rendering the vests unwearable.

127.    Instead, PBE warrants the SSBS to be "highly-effective," as providing optimal protective coverage, as preventing the rolling or sagging of the ballistic panels inside the carrier and as "maintaining the coverage of the ballistic panels," all for a duration of "throughout the life of the vest."

128.    Additionally, in an effort to cover-up the defective SSBS in its vests after Plaintiffs first brought these issues to light, PBE nationally published knowingly false and deceptive information as to the performance and effectiveness of the SSBS.  The material was disseminated to state representatives of more than twenty-six states, including Florida. The published information deceives consumers and affirmatively conceals the known latent defects in the SSBS Vests so to maintain existing sales and induce continued sales of the vests.  By way of more specific examples regarding these published statements:

(a)  Defendant knowingly and falsely stated that it rigorously tested the SSBS when in fact it did not.

(b)  Defendant also falsely represented that a consultant confirmed that Point Blank's SSBS Vests are durable, safe, and comply with Point Blank's representations and warranties, when in fact the consultant had not and had never even seen a SSBS Vest other than a photograph.

(c)  Defendant further falsely represented that the consultant confirmed that the SSBS straps will not detach from the bird's mouth even after extensive use and aging, when in fact the consultant had not.

(d)  Defendant's representations were based on supposedly rigorous and proper testing, which in fact was not true.  And, the testing that was performed was on SSBS components, as opposed to SSBS Vests.  Defendant represented that all of its SSBS Vest models were safe and effective as a result of supposed testing, and improper purposefully-limited testing of SSBS components only.

(e)  Furthermore, the SSBS components that were tested were not the knock-off Chinese materials currently being used in Defendant's SSBS Vests, rather Defendant's representations were based on purposefully-limited testing of real Velcro and Breathe-o-Prene SSBS components.

129.    The uniform defects in SSBS Vests and Defendant's common pattern of concealing material information and affirmatively providing false and misleading representations regarding the SSBS defects are pervasive, deceptive and unfair.

130.    Additionally, that Defendant's documents concealed and affirmatively misrepresented material information, including to the nation's largest contracting and purchasing

31

agents, is readily demonstrable.  Indeed, the State Procurement Administrator for Colorado (the Lead State for the National Association of State Procurement Officials ("NASPO") Master Contract for body armor), a group that negotiates the contracts for purchase of body armor (and determines whether SSBS Vest are included in those contracts) for twenty-six states, including the State of Florida's master body armor contract, recently testified after reviewing just a small fraction of the concealed documents, "If I was aware of the problem, I certainly wouldn't continue to buy the product."  She additionally testified, "Q. Do you believe that you were kept in the dark -- on a fair amount of information that would have been material to you? A. Based on what I've seen today and the information that I've received regarding the vests and the lawsuit, there's a significant amount that I was not provided with, yes."  She further testified, "Do you believe that law enforcement officers should be entitled to see and review the information that you've seen today and earlier this morning when making a decision on purchasing a life-critical product?  A. If I were an officer, I'd want to see it, yes."  She also testified, "Q. And as a person making a decision on whether to authorize certain models of vests to be on a list to be sold in your state and potentially others, you would have wanted to see all of this information beforehand; is that fair?  A. I would want to provide all the information that is available on the product to the customer and let them make an informed decision about whether or not they want to purchase the vest."

131.    To this day, Defendant continues to conceal this information from all purchasers and users of SSBS Vests.

132.    Defendant's false representations emanated from Florida, were uniform, were made to induce sales, and are quintessentially false and deceptive.

**The Defect Rate Exceeds 10%**

133.    Given that a ballistic vest is a safety product, Defendant's consultant indicated that a failure rate of 10% would be an obvious "red flag."

134.    Purchasers have reported failure rates in excess of 10% statewide within their agency and as high as 60% of respondents.

135.    There is no adequate remedy for the latent material, manufacturing, workmanship and design defects that exist in PBE's SSBS Vests.

136.    PBE's Care and Maintenance Manual warns, "DO NOT attempt to repair the garment yourself."  Similarly, National Institute of Justice standards and guidelines warn end users to "[n]ever attempt to repair armor panels under any circumstances."[4]

137.    Providing additional sets of shoulder straps does not fix the defects in PBE's SSBS Vests, nor does replacing the c-clamps with the same defective material.  Laboratory test data demonstrates that new straps placed in a used clamp will either not work properly from the start or exhibit an even more severe degradation than a new strap and new clamp combination.  Put differently, laboratory testing confirms that replacing a defective strap with another defective strap is not an adequate remedy.  PBE knew that lab testing of a new strap in a used vest reveals this accelerated deterioration but affirmatively concealed this information from all purchasers.

138.    Because the SSBS is a component of, and incorporated into, the ballistic panel system, when it wears out or otherwise fails (as is happening as soon as within a few months) there is no non-destructive means for an end user to remedy that situation.

139.    Furthermore, while PBE's warranties are not limited to repair or replacement, a purported remedy of "repair" fails of its essential purpose and is unconscionable because: (i) the defects in the SSBS Vests are latent and not discoverable on reasonable inspection; (ii)

---

[4] The NIJ does not certify the SSBS in an SSBS Vest.

Defendant was aware of the problems with the vests; (iii) there is no indication that Defendant can repair the latent defects; (iv) the length of time Defendant admits it takes to attempt a repair (two weeks to a month) coupled with mandatory wear policies governing officers, effectively prevent attempted repair from being a true remedy or option - officers cannot go on duty without their vests for one shift let alone weeks; and (v) Defendant's repeated efforts to stop the SSBS failures, including for example in Trooper Koontz's vest, have been unsuccessful; thus, they deprive class members of the substantial value of their bargain, leaving them without a remedy.

140.    Even were PBE to take apart the ballistic panel system to replace the worn Velcro-like material and other components of the SSBS, doing so may also violate NIJ standards or guidelines which state in pertinent part: "**Note that the covers of the armor panels should not be opened for any reason.**"   NIJ Selection & Application Guide 0101.06 to Ballistic-Resistant Body Armor, p. 33 (emphasis in original).

**Warranties**

141.    PBE made express representations and warranties regarding the SSBS Vests to the Individual Plaintiffs and class members that were part of the basis of the bargain.

142.    Defendant made certain express warranties regarding the qualities and performance characteristics of all SSBS Vests.

143.    Defendant provides an express warranty to Individual Plaintiffs and all class members on the labels on the face of the ballistic panels of which the SSBS is a part (directly integrated/sewn into) that warrants, "Warranty Period: 5 Years."   Two photographic examples of this express warranty are below:

This express warranty is not ambiguous. It does not have *any* limitations, conditions precedent or exclusions. It does not have *any* strings attached.  It does not limit the warranty to repair or replacement or to only some fractional portion of the ballistic system to which it is affixed.  It does not require *any* inspection by Defendant *or* return of the product to Defendant.  It does not state that use of duct tape, electrical tape or safety pins voids the warranty.  Rather, *it is a straightforward unconditional warranty for 5 years*.

144.    Additionally, after every sale, each SSBS Vest came with a Care and Maintenance Manual containing terms of certain additional express warranties provided by PBE to each Individual Plaintiff and class members, and a Warranty and Customer Response Card from PBE which class members were asked to return directly to PBE in Florida.  A copy of the Care and Maintenance Manual is attached hereto as **Exhibit A**.[5]

145.    The express five-year warranty in the Care and Maintenance Manual further provides:

> Point Blank Enterprises warrants the ballistic panels for a period of five (5) years against manufacturing defects.

---

[5] PBE otherwise instructed all purchasers to directly interact with it in Florida.  For example, another provision of the warranty (for tears in the ballistic panel cover) instructs purchasers to return their vests to Defendant - "Should the soft body armor ballistic panel cover be compromised (cut, torn or frayed); it should not be worn and immediately returned to the manufacturer for inspection and repair."

The SSBS is a component of the soft ballistic panel system of an SSBS Vest and is not in any way

part of the outer carrier system.  The above warranty is not limited to part of the ballistic panel, it is not limited to the ballistic panel cover, the ballistic fibers, the stitching, or any other component.

It is an unambiguous warranty covering the entirety of the ballistic panels, including the SSBS.

146.    The five-year warranty in the Care and Maintenance Manual goes further and makes clear that the warranty covers all "components" of the ballistic system.  As discussed above, the SSBS is a "self-suspending *ballistic system*."  PBE expressly warrants all components of the ballistic panel system of its SSBS Vests for a five-year period:

> "During the warranty period, *any* soft ballistic *component* having a manufacturing or material defect, as determined through inspection by an authorized Point Blank representative, will be repaired or replaced at no cost to the customer."

(emphasis added).

147.    PBE's express warranties in its Care and Maintenance Manual for all SSBS Vests are uniform, regardless of the particular model of SSBS Vest purchased and regardless of the purchaser.

148.    PBE made yet additional express representations and warranties regarding the SSBS Vests to the Individual Plaintiffs and class members through its website advertisements and PBE's other sales and marketing materials.  In all of these materials, PBE consistently represented that the SSBS is a Self-Suspending Ballistic System, not an outer carrier system, warranted not only for the five-year period for "components" of the "ballistic system" but also warranted to "keep[] the ballistic panels completely suspended…throughout the life of the vest," which is at minimum the five-year warranty.

149.    More specifically, at all relevant times, Defendant warranted and advertised on its website and in other materials disseminated throughout Florida and the country including to the Individual Plaintiffs and all class members: [6]



150.    Defendant also warranted to the Individual Plaintiffs and all class members that the SSBS Vests (and its components) would be free from defects in materials and workmanship, and were merchantable, and fit for their ordinary use.

151.    There are undisclaimed implied warranties that the SSBS Vests are merchantable and fit for the ordinary use for which they are sold.  Any purported language of disclaimer is not conspicuous, set apart, and otherwise does not legally exclude the implied warranties.

152.    The Individual Plaintiffs and class members purchased their SSBS Vests either directly from Defendant or from one of Defendant's authorized representative distributors. Defendant's authorized representatives and distributors were not intended to be the ultimate consumers of the SSBS Vests.  Rather, the Individual Plaintiffs and class members were also the intended third-party beneficiaries of the warranties associated with the SSBS Vests.

153.    Defendant has breached express and implied warranties in that, among other

---

[6] As mentioned above, these advertisements (on Defendant's website and in its marketing materials still today) are false. PBE ceased using Breathe-O-Prene years ago.  Even when it did use Breathe-O-Prene, laboratory data demonstrates that it too was inappropriate for use, defective in material and workmanship and rapidly fails.  Recognizing the true effectiveness and durability of Breathe-O-Prene, Medicare authorizes payment for new Breathe-O-Prene straps for CPAP masks every 90 days.

things, the SSBS Vests do not pass without objection in the trade, are unsuitable for the ordinary and intended uses for which they were sold and are not merchantable.  The fact that they have been barred for sale in certain states strongly supports that they are not merchantable.

154.    Defendant breached its express warranties by not providing a product which could provide the benefits described in the labels and advertising and that is not free of defects in material and workmanship.  As a result of Defendant's breaches of its contracts and warranties, the Individual Plaintiffs and class members have been damaged in the amount of the purchase price of their SSBS Vests.

**Damages**

155.    Plaintiffs Koontz, Purpura, Rohner, Pater, and Deshuk purchased

156.     SSBS Vests that are defective in that they have failed, pose a safety risk and cannot be safely worn.  They, and all class members, have incurred a common injury, loss in value and not having received the benefit of the bargain.  The SSBS prematurely fails resulting in the ballistic panels detaching from the shoulder straps.  This has occurred while the Individual Plaintiffs were on duty in the field.  The Individual Plaintiffs purchased SSBS Vests that fell apart within their warranty period (as soon as within one year) and do not comply with the warranties because, among other things, the vests contain defects in materials and workmanship, are not suitable for their intended life-critical purposes and are not merchantable.   The vests physically could not be worn without duct tape, safety pins, or similar measures.

157.    Their damages and the damages of all class members is the purchase price of the vest (and the Court so held – "The injury in fact is the purchase price of the defective vest, this harm is fairly traceable to Defendant as manufacturer of the vest and damages would remedy the harm by making the individual Plaintiffs' whole."  Case 0:17-cv-62051, D.E. 185, fn. 6).

38

158.     Named Plaintiff OSTA has incurred direct financial loss, including having paid for the replacement of defective SSBS Vests.  As indicated above in paragraph 8, IUPA has an extensive membership in 26 states (including in Florida), many of whom have purchased SSBS Vests.  Members of IUPA, including in Florida, have experienced failure of the SSBS in their vests.  IUPA has similarly incurred time and expense stepping forward to address this safety issue on behalf of its constituent members, including those in Florida with SSBS Vests.  IUPA and its representatives have incurred time and expense, not only through extensive discovery in the first part of this litigation, including through document production and providing a deposition (exceeding five and a half hours), it incurred time and expense through prelitigation efforts working with counsel in the preparation of the litigation on behalf of its membership, notifying and working with certain of its members to investigate  their experiences with SSBS Vests, assisting in locating vests for laboratory testing, and much more.

159.     The Individual Plaintiffs and class members purchased SSBS Vests that do not provide the represented and warranted characteristics, are unsuitable for their ordinary use, are not merchantable and present a significant safety risk.

160.     The Individual Plaintiffs and class members, as reasonable consumers, would not have purchased SSBS Vests had they known of the latent manifest defects in the SSBS and that it would fail as described herein, such that their vest could not be properly worn.

## CLASS ACTION ALLEGATIONS

161.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3), for Counts I-III, and 23(b)(2), for the injunctive relief sought in Count III, on behalf of themselves and the following class of other individuals and entities, being more particularly described as follows (the "Class"):

For purposes of Plaintiffs' FDUTPA claims, Plaintiffs define the Class as including:

All individuals and entities in the fifty United States and the District of Columbia (with the exception of Alabama and California) that purchased a new concealable Hi-Lite/Perform-X, Vision/Blue Steel or Elite model vest with a Self-Suspending Ballistic System from Defendant or one of Defendant's authorized distributors or sales representatives from December 16, 2013 up to the date a Class is certified by this Court

For purposes of the Individual Plaintiffs' warranty claims, the Class includes:

All individuals and entities in Florida, Georgia, Illinois, Indiana, Maryland, Michigan, New Jersey, New York, Ohio, Pennsylvania, Texas, Virginia, and Washington that purchased Hi-Lite/Perform-X, Vision/Blue Steel or Elite model vest with a Self-Suspending Ballistic System from Defendant or one of Defendant's authorized distributors or sales representatives from December 16, 2012 up to the date a Class is certified by this Court.[7]

Both classes exclude Defendant, its affiliates, parents and subsidiaries, all directors, officers, agents, and employees of Defendant, its distributors and federal agencies.[8]

---

[7]   As set forth above, the initial Complaint in this litigation was filed on October 19, 2017 and the Court's dismissal without prejudice was entered October 29, 2018, thus tolling the statute of limitations for Plaintiffs' and all class members' claims for 1 year and 10 days.  Accordingly, the class period for the FDUTPA claims commence five years and ten days prior to this filing, and the warranty class on Defendant's five-year warranties commence six years and ten days prior to this filing.

[8]   Significantly more narrowed than in the prior Complaint, Plaintiffs now assert classes for just the *concealable* line of SSBS Vests, not Defendant's tactical, SWAT, correctional or other models containing a SSBS.  Critical to scope of the asserted classes, on June 29, 2017 in *Carter v. Forjas*, 701 Fed. Appx. 759; 2017 U.S. App. LEXIS 11615; 2017 WL 2813844 (11th Cir. 2017), a case arising out of an order from this District, the Eleventh Circuit affirmed certification of the class and clarified/rejected the limitations some courts read *Prado* as placing on a named plaintiff's standing to assert claims for an entire product line.  More specifically, a sheriff's deputy filed a class action on behalf of purchasers of *nine* different models of Taurus handguns all alleged to have substantially the same defect in the safety switch resulting in a possibility of firing if dropped, with the safety switched engaged.  As to the issue of standing, the District Court held:

> [Counsel] objects that the named Plaintiff lacks standing because he did not purchase his weapon and that commonality is not met and subclasses are needed **because there are nine Class Pistol models which differ in design and value**. [DE 136 at 29; DE 182 at 23.]…These conclusory objections are without merit. **Plaintiff has standing because he is the current owner of a Class Pistol, which suffers the same alleged defects as each Class Pistol model**.

*Carter v. Forjas Taurus S.A.*, No. 1:13-CV-24586-PAS, 2016 U.S. Dist. LEXIS 96054, *27 (S.D. Fla., July 22, 2016) (emphasis added).  On appeal the Eleventh Circuit likewise rejected the standing challenges and affirmed the District Court. *Carter,* 701 Fed. Appx. at 765 ("Carter

162.    In the alternative should the Court still determine that Plaintiffs lack standing to

assert claims on behalf of all purchasers of these new *concealable* model SSBS Vests, Plaintiffs

request the Court certify the following classes of purchasers of new concealable Hi-Lite, Vision

and Elite SSBS Vests (the models purchased by the Individual Plaintiffs):[9]

> For purposes of Plaintiffs' FDUTPA claims, Plaintiffs define the Class as including:
>
>> All individuals and entities in the fifty United States and the District of
>> Columbia (with the exception of Alabama and California) that purchased a new
>> concealable Hi-Lite, Vision or Elite model vest from Defendant or one of
>> Defendant's authorized distributors or sales representatives from December 16,
>> 2013 up to the date a Class is certified by this Court.
>
> For purposes of the Individual Plaintiffs' warranty claims, the Class includes:
>
>> All individuals and entities in Florida, Georgia, Illinois, Indiana, Maryland,
>> Michigan, New Jersey, New York, Ohio, Pennsylvania, Texas, Virginia, and
>> Washington that purchased a new concealable Hi-Lite, Vision or Elite model
>> vest from Defendant or one of Defendant's authorized distributors or sales
>> representatives from December 16, 2012 up to the date a Class is certified by
>> this Court.

163.    Both classes exclude Defendant, its affiliates, parents and subsidiaries, all

directors, officers, agents, and employees of Defendant, its distributors and federal agencies. At

---

alleged he owned a class gun that suffered from the same defects as the rest of the class guns.
**Thus, Carter suffers from the same alleged injury as the rest of the class. We discern no
other standing defects**.") (emphasis supplied0
    Following *Carter*, the court in *Amin v Mercedes Benz USA, LLC*, No. 1:17-CV-1701-AT,
2018 U.S. Dist. LEXIS 40603 (N.D. Ga. March 13, 2018) (Totenberg, J) discussed both *Prado*
and *Carter*, then explained and held:
> *Prado–Steiman's* basic holding was that "at least one named representative of each
> class or subclass [must have] standing for each proffered class or subclass ***claim***."
> 221 F.3d at 1280. Thus, what really matters at this stage are *claims*, **whether or not
> they involve more than one particular model of a product**….in *Carter v. Forjas
> Taurus, S.A.*...[t]he class-representative deputy sheriff had bought only a single model
> of the nine models of guns at issue but the court found that he had standing as to the
> other models… Thus, even if Plaintiffs did not purchase each of the Mercedes–Benz
> car models themselves, the HVAC systems in the identified models they did purchase
> "suffered from the same defects as the rest of the" models**.**
*Amin*, 2018 U.S. Dist. LEXIS 40603 at * 11 (italics in original, bold added).
[9]   These models are the upper-end models and Defendant's sales databases reflect that tens of
thousands of these models were sold throughout the country during the class period.

all relevant times, Defendant has manufactured and sold *only four* models of *concealable* vests containing the SSBS.

164.    More specifically, Defendant has represented and advertised throughout the country to all purchasers that it manufactures and sells *four models* of *concealable* SSBS Vests under its PBBA brand – the Standard, Hi-Lite, Vision and Elite (**Exhibit B** hereto),[10] and *only three models* of *concealable* SSBS Vests under the PACA brand name – the Standard, Perform-X and Blue Steel (**Exhibit C** hereto).

165.    However, the *PBBA Standard* model is identical to the *PACA Standard* model (other than the name/logos) and is the same exact vest simply marketed under two brand names. Other than in name and visual format, Defendant's detailed model specification "Sales Sheets" for the two vests, marketed to all purchasers and published on its website, are also verbatim for both.  Furthermore, Defendant's internal computer and sales systems also list the Standard vest, regardless of brand, as the same vest.

166.    Likewise, the *PBBA Vision* model and the *PACA Blue Steel* model are identical (other than the name/logos) and the same exact vest simply marketed under two brand names. Other than in name and visual format, Defendant's detailed model specification "Sales Sheets" for the two vests, marketed to all purchasers and published on its website, are also verbatim for both.  Furthermore Defendant's internal computer and sales systems designate the Vision and Blue Steel vest as the same vest – VISION/BLUE STEEL

167.    And, the *PBBA Hi-Lite* model and the *PACA Perform-X* model are identical (other than the name/logos) and the same exact vest simply marketed under two brand names. Other than in name and visual format, Defendant's detailed model specification "Sales Sheets"

---

[10] The Python and Executive concealable vests are not SSBS Vests.

for the two vests, marketed to all purchasers and published on its website, are also verbatim for both.  Furthermore, Defendant's internal computer and sales systems designate the Hi-Lite and Perform-X vest as the same vest  -  HILITE/PERFORMX

168.    In other words, at all relevant times, Defendant has actually manufactured and sold *only four concealable* models of vests that contain the SSBS – the Standard, Hi-Lite/Perform-X, Vision/Blue Steel and the Elite.

169.    The fact that these vests are available in different sizes and available in different color carriers (tan, navy, black, white, etc.) or that they are made for males and females, or that the carriers can be customized to add a loop for a radio microphone or a special name tag does not change the fact that Defendant only manufactures four models of concealable SSBS Vests.  These options have nothing whatsoever to do with the SSBS and the defects causing its premature failure.  As indicated above, those defects manifest in all SSBS Vests at the manufacturing line.

170.    At all relevant time periods the SSBS in all of these concealable models was identical or substantially the same (and Defendant has so represented in marketing materials, press releases and otherwise, including to governmental entities and State purchasing agents).  In fact, Defendant has represented to all purchasers as recently as January, 2018 that the SSBS straps and clamps are identical in not only all concealable SSBS Vests but in all of Defendant's other non-concealable vests containing an SSBS as well (tactical, correctional, SWAT, etc.).

171.    The prerequisites to class certification under Fed.R.Civ.P. 23(a) are met in that:

(A)    The members of the Class are so numerous that joinder of all members is impractical.  There are tens of thousands of class members.  The precise number of class members, their identities, the organization or entity (where applicable) to which each purchaser is associated, the date of purchase, the location of purchase, the model SSBS Vest purchased, the serial numbers of the ballistic panels, the date of manufacture, the

dates of issuance and invoicing, where Defendant shipped each vest, the exact price Defendant received for each vest and more is all readily shown in Defendant's sales databases.

(B)      The claims of the Named Plaintiffs[11] raise questions of law and fact common to all

class members. Among the questions of law and fact common to the Class are the following:

(i)      Whether the SSBS Vests are defective;

(ii)     Whether the SSBS Vests fail to comply with the express and implied warranties provided by PBE;

(iii)    Whether PBE knew or should have known about the SSBS defects, and, if so, how long PBE knew or should have known of the defects;

(iv)     Whether PBE misled and continues to mislead purchasers regarding the qualities, characteristics and performance of the SSBS;

(v)      Whether PBE concealed the defective nature of its SSBS Vests from the class members;

(vi)     Whether PBE represented, through its words and conduct, that the SSBS Vests and SSBS had characteristics, uses, or benefits that it did not actually have, in violation of the FDUTPA;

(vii)    Whether PBE represented, through its words and conduct, that the SSBS Vests and SSBS were of a particular standard, quality, or grade when they were of another, in violation of the FDUTPA;

---

[11] As noted in ¶¶ 7, 9 *supra*, OSTA and IUPA are Named Plaintiffs for injunctive relief sought in Count IV only.

(viii)    Whether PBE's affirmative misrepresentations about the true defective nature of the SSBS Vests were likely to create confusion or misunderstanding in violation of the FDUTPA;

(ix)    Whether PBE's affirmative misrepresentations about the true defective nature of the SSBS Vests were and are deceptive within the meaning of the FDUTPA;

(x)    Whether PBE has otherwise engaged in unfair and deceptive conduct in connection with the manufacture, marketing and sale of SSBS Vests, including failing to act honestly and in good faith and fair dealing;

(xi)    Whether the SSBS Vests were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability; and

(xii)    The measure of damages.

(C)    The claims of the Individual Plaintiffs are typical of, if not identical, to the claims of each member of the Class because they and all class members purchased SSBS Vests which all suffer from the same latent defects in the SSBS, PBE's conduct in its marketing and sale of its SSBS Vests was uniform, including its failure to disclose the defects in the SSBS Vests, and all class member claims are grounded in the same warranties, as well as uniform deceptive and unfair acts and omissions by Defendant.  The application of legal principals and proof will essentially be the same for all class members.

(D)    The Named Plaintiffs will fairly and adequately protect the interests of all class members. They have retained competent counsel who are experienced in complex litigation, including class action litigation involving defective body armor, and who will prosecute this action vigorously.  Named Plaintiffs will fairly and adequately assert and

protect the interests of the Class. They do not have any interests antagonistic to or in conflict with the Class; their interests are antagonistic to the interests of the Defendant; and they will vigorously pursue the claims of the Class.  Named Plaintiffs have adequate financial resources to vigorously pursue this action, including an agreement by their counsel to prosecute this action on a contingent basis and to advance the reasonable and necessary costs and expenses of litigation.

172.    Counts I through III of this action may be maintained as a class action under Fed.R.Civ.P. 23(b)(3) because the questions of law or fact common to the class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The pertinent factors under Rule 23(b)(3) that demonstrate that a class action is a superior method of litigating this controversy include:

(A)    The class members' interests in individually controlling the prosecution or defense

of separate actions: In view of the complexity of the issues and expense of litigation, it is impractical for class members to bring separate actions, and there is no reason to believe that class members desire to proceed separately. This is particularly so given that separate claims of individual class members are insufficient in amount to support separate actions;

(B)    The nature and extent of any litigation concerning the controversy already begun by or against class members: To Plaintiffs' knowledge, no other cases are pending against PBE concerning the class members' claims and thus, certification is appropriate here on the grounds of judicial economy;

(C)      The desirability or undesirability of concentrating the litigation of the claims in this

forum: The Southern District of Florida is a desirable and appropriate forum to concentrate litigation of the claims of the class members because witnesses and evidence relevant to their claims is concentrated in this forum, because Defendant's principal place of business is in this forum, and because substantially all of the acts and omissions alleged herein emanated from and were controlled by Defendant from facilities in this forum, including the design, manufacture, marketing and distribution of the SSBS Vests; and

(D)      The likely difficulties in managing a class action: This case presents no unusual management difficulties, and to the contrary, is ideally suited to class treatment. The claims involve issues based on the uniform warranties, uniform latent defects, the same vests problems, and the size of the Class is too large for individual litigation, but not so large as to present an obstacle to manageability as a class action.  Additionally, the amount which may be potentially recovered by individual members of the Class -- up to approximately $700, representing the average purchase price of an SSBS Vest -- will be large enough in relation to the expense and effort of administering the action to justify a class action.

173.    Plaintiffs' claim for injunctive relief pursuant to FDUTPA in Count III of this action may be maintained as a class action under Fed.R.Civ.P. 23(b)(2) because all the prerequisites of Rule 23(a) are satisfied and because PBE has acted or refused to act on grounds that apply generally to the Class so that final injunctive relief is appropriate respecting the Class as a whole.

CLAIMS FOR RELIEF
Count I
**Breach of Warranty in Warranty Statements**
**(Individual Plaintiffs, Individually and on Behalf of the Class v. PBE)**

174.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-150, and 152-172 above as if fully set forth herein.

175.    Each SSBS Vest sold by PBE included express warranties that the vest was free of defects in materials and workmanship and conformed to certain performance standards as set forth above.

176.    Defendant has breached its express warranties regarding the characteristics of the SSBS Vests as contained in the warranty provided by Defendant.  The degradation and sudden failure (as soon as within one year) of the SSBS breaches the warranty against defects in materials and workmanship.  Additionally, the SSBS is not "highly-effective" and does not in fact last "throughout the life of the vest."  Nor does it "keep[] the ballistics completely suspended... throughout the life of the vest."  Similarly, the SSBS is not "robust enough to handle different wear and climate conditions."

177.    Defendant has breached its express warranties regarding its obligations to repair or replace the defective SSBS Vests at no cost to all purchasers.  And, as set forth above, Defendant's express warranties fail of their essential purpose and are unconscionable.

178.    As a result of these breaches of warranty, class members have been damaged in the amount of the purchase prices of their vests and have not received the benefit of the bargain.

179.    The Individual Plaintiffs have complied with all applicable notice requirements.

WHEREFORE, in accordance with the allegations of the First Claim for Relief, the Individual Plaintiffs demand the following for themselves and the Class against Defendant PBE:

48

(a)   That the Court certify the Classes as described above and appoint Individual Plaintiffs as class representatives and undersigned counsel as class counsel;

(b) That judgment be entered in favor of Plaintiffs and the Classes against Defendant for all compensatory losses and damages allowed by law;

(c)   An award of pre-judgment and post-judgment interest at the maximum legal rate to the Individual Plaintiffs and class members on their damages;

(d)   Awarding Plaintiffs their costs incurred in pursuing this action; and

(e)   Such other and further relief as is just and appropriate.

**Count II**
**Breach of Implied Warranty of Merchantability**
**(Individual Plaintiffs, Individually and on Behalf of the Class v. PBE)**

180.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-126 and 133-172 above as if fully herein.

181.     Each SSBS Vest sold by PBE, by operation of law, came with an implied warranty that it was merchantable.

182.     The Individual Plaintiffs and all class members were and are foreseeable users of the SSBS Vests and have used such vests in their intended manner and for their intended purpose.

183.     The SSBS Vests were defective when transferred from PBE, the warrantor. Among other things, the degradation and sudden failure (as soon as less than one year) of the SSBS breaches the implied warranty of merchantability.  In fact, when the SSBS fails, the SSBS Vest is no longer able to perform as a vest, as the SSBS is what holds the vest together and allows it to be worn as a vest.

184.    As a direct and proximate result of these breaches of the implied warranty of merchantability, the Individual Plaintiffs and class members have been damaged in the amount of the purchase price of their vests.

185.    The Individual Plaintiffs have complied with all applicable notice requirements.

WHEREFORE, in accordance with the allegations of the Second Claim for Relief, the Individual Plaintiffs demand for themselves and the Class against Defendant PBE:

(a)     That the Court certify the Class as described above and appoint Individual Plaintiffs

        as class representatives and undersigned counsel as class counsel;

(b)     That judgment be entered in favor of Plaintiffs and the Class against Defendant for all compensatory losses and damages allowed by law;

(c)     An award of pre-judgment and post-judgment interest at the maximum legal rate to the Individual Plaintiffs and class members on their damages;

(d)     Awarding Plaintiffs their costs incurred in pursuing this action; and

(e)     Such other and further relief as is just and appropriate.

**Count III**
**Deceptive and Unfair Trade Practices**
**(Plaintiffs, other than Plaintiff Koontz, Individually and on Behalf of the Class v. PBE)**

186.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1-150 and 152-173 as if fully set forth herein.

187.    The Individual Plaintiffs and class members are "consumers" as defined by Fla. Stat. § 501.203(7), and, subsequent to the 2001 amendment and applicable case law, "persons" pursuant to Fla. Stat § 501.211(2).

188.    All Plaintiffs are "persons" pursuant to Fla. Stat. §501.211(1).

189.    At all relevant times hereto, PBE's actions in designing, manufacturing,

50

advertising, marketing, soliciting, offering, promoting and selling the SSBS Vests constituted "trade or commerce" under Fla. Stat. § 501.203(8).

190.     Within the four-year period prior to the filing of the Complaint and continuing to the present, PBE, in the course of trade and commerce, engaged in unconscionable, unfair, and/or deceptive acts or practices harming the Individual Plaintiffs and class members as described herein.

191.     The Individual Plaintiffs and class members purchased PBE's SSBS Vests as part of a consumer transaction.

192.     PBE engaged in deceptive, misleading and unfair conduct in the marketing and sale of its SSBS Vests (a defective product which presents a public hazard and which places the lives of law enforcement officers at unjustifiably heightened risk).  PBE continues to engage in deceptive acts and practices in trade and commerce with respect to the sale of SSBS Vests.   This conduct includes, among other things: (i) representing that its SSBS Vests have characteristics and benefits they do not have; (ii) representing that its SSBS Vests are of a particular standard or quality when they are not; (iii) knowingly issuing deceptive and misleading information regarding the durability, effectiveness  and performance of the SSBS system, including in nationally-published material released as recently as January 19, 2018; (iv) representing to Plaintiffs and class members that the latent defects and resulting failures of the SSBS are a result of purported misuse by not disconnecting the SSBS in some gentle, special and impractical manner never disclosed to class members; and (v) failing to disclose material facts regarding the premature failure of the SSBS rendering the SSBS Vests worthless to officers.

193.     PBE further engaged in deceptive, misleading and unfair conduct including but

not limited to: (i) failing to notify the Individual Plaintiffs and the Class of the defects in the SSBS Vests and that the vests are prone to falling apart at any moment in the line of duty; (ii) selling SSBS Vests (or permitting them to be sold either directly or through its distribution channels), that are represented to be new but in fact have ballistic panels with manufacture and issue dates up to four and a half years old; (iii) informing class members that replacement SSBS straps will correct the failures (known undisclosed latent defects) and charging class members for replacement SSBS straps if their vests are more than two years old; and (iv) failing to honor its warranties and recall and replace the defective SSBS Vests.  These actions constitute unfair and deceptive acts or practices in the conduct of trade or commerce in violation of Fla. Stat. § 501.204.

194.    The Individual Plaintiffs and class members were exposed to Defendant's national, multimedia marketing campaign touting the supposed durability, quality and performance of its SSBS Vest and purchasers justifiably made their decisions to purchase SSBS vest as a result of Defendant's misleading marketing and concealment of the true, defective nature of the SSBS.  Further, Defendant has knowingly misled and concealed from the Individual Plaintiffs and class members about the true, defective nature of the SSBS.

195.    Defendant also tells class members who call its customer service about failure of their SSBS failures that it is unaware of any issue or complaints about the SSBS.

196.    PBE's deceptive, misleading and unfair conduct is likely to mislead consumers acting reasonably under the circumstances, to the consumer's detriment.

197.    In fact, PBE's deceptive, misleading and unfair conduct did mislead the Individual Plaintiffs, who acted reasonably under the circumstances, to their detriment, as they purchased a bullet resistant vest that cannot be properly worn and is thus worthless.  Had PBE

disclosed the true nature of its SSBS Vests, the Individual Plaintiffs and class members would not have purchased them.

198.    All or substantially all of the relevant events, acts and omissions at issue, including the design, material selection and purchases, manufacture, marketing and distribution of the defective SSBS Vests, occurred and/or emanated from and continue to be tightly controlled from, occur and emanate from Defendant's principal place of business (and its design and manufacturing facilities) in Pompano Beach, Florida.

199.    As a direct and proximate result of PBE's practices in violation of Fla. Stat. §501.204, the Individual Plaintiffs and members of the Class have incurred actual damages in the amount of the purchase price of their vests.

200.    Pursuant to Fla. Stat. §§ 501.211 and 501.2105, the Individual Plaintiffs and the Class are entitled to recover from PBE reasonable attorneys' fees and costs incurred in this action.

201.    Hundreds of thousands of SSBS Vests that are within their five-year warranty period have been purchased by class members including law enforcement personnel.

202.    Hundreds of thousands of class members, including law enforcement personnel and others who use the SSBS Vests and continue to purchase the SSBS Vests are unaware of the defects in the vests.

203.    As set forth herein, Plaintiffs and class members are persons "aggrieved" by Defendant's deceptive, unfair, and/or unconscionable acts and practices such that they are entitled to affirmative injunctive relief requiring Defendant to cease selling the defective SSBS Vests and to notify all class members of the defects in the vests and the life-threatening danger associated with continued use, including the sudden and unexpected failure of the SSBS while in

53

the line of duty causing the ballistic panels to detach from the shoulder straps, rendering it useless as a vest.

204.     The Individual Plaintiffs purchased SSBS Vests as a result of Defendant's deceptive, unfair, and/or unconscionable acts and practices as set forth herein.

205.     Plaintiff OSTA's and Plaintiff IUPA's members have purchased large quantities of SSBS Vests as a result of Defendant's deceptive, unfair, and/or unconscionable acts and practices as set forth herein.  Plaintiffs OSTA and IUPA have and assert associational standing to bring this claim for injunctive relief.

206.     Plaintiffs further show that PBE, either directly or through its agents, distributors, partners, retailers and distribution channels has been selling SSBS Vests represented to be brand new but in fact contain ballistic panels that have dates of manufacture and dates of issue as old as four years prior.  More specifically and by way of example, as part of Plaintiffs' investigation into the facts and circumstances hereof, a new PBBA Vision vest was purchased in April, 2017 from Galls, LLC., a PBE authorized distributor.  That vest, shipped a few days later, contained a new outer carrier but hidden inside and undisclosed were ballistic panels that were four and a half years old having a "date of manufacture" and "date of issue" in September, 2012, serial numbers 120001166976 and 120001166988.  The warranty for the SSBS Vests states that it runs from the date of issue.  Thus, rather than receiving a vest with a five-year warranty, the vest purchased in April 2017 had just a few months of warranty left.

207.     Named Plaintiffs have a substantial likelihood of success on the merits.  Indeed, prior problems and unfair and deceptive conduct with various PBE brand vests spawned multiple class actions, a nation-wide safety notice, cessation of sale and the recall and replacements of tens of thousands of vests.  *See* footnote 1, *supra* (list of prior actions against Defendant's

subsidiaries).  Here, the acute safety issue and injury to class members outweighs whatever damage the requested injunction may cause PBE.  Furthermore, the requested injunction, if issued, will be in the best interest of the nation's law enforcement community and the public interest as opposed to being adverse to the public interest.

208.    If the injunctive relief is not provided, then irreparable injury to some users, *i.e.,* bodily injury, may result.

209.    This injunctive relief is appropriate in accordance with Fed.R.Civ.P. 23(b)(2).

WHEREFORE, in accordance with the allegations of the Third Claim for Relief, the Plaintiffs (except Plaintiff Koontz) demand the following for themselves and the Class against Defendant:

(a)    That the Court certify the Class as described above as a Rule 23(b)(3) class for monetary damages and appoint the Individual Plaintiffs (except Plaintiff Koontz) as class representatives and undersigned counsel as class counsel;

(b)    That judgment be entered in favor of the Individual Plaintiffs and the Class against

Defendant for all damages allowed by law;

(c)    An award of pre-judgment and post-judgment interest at the maximum legal rate to the Individual Plaintiffs and class members on their damages;

(d)    That the Court certify the Class as described above as a Rule 23(b)(2) class for injunctive relief and appoint all Plaintiffs (except Plaintiff Koontz) as class representatives and undersigned counsel as class counsel;

(e)    That this Court enter injunctive relief in favor of Plaintiffs (except Trooper Koontz) and the Class against Defendant as requested requiring Defendant to cease

selling SSBS Vests and to notify all class members of the defects and life-threatening safety problems with the vests;

(f)     That the Court award attorneys' fees, costs and expenses of litigation; and

(g)     Such other and further relief as is just and appropriate.

## **DEMAND FOR JURY**

Pursuant to Rule 38, Fed.R.Civ.P., Plaintiffs hereby demand a Jury Trial in this matter on all issues so triable.

Respectfully submitted this 25th day of December, 2018.

**MOSKOWITZ, MANDELL, SALIM & SIMOWITZ, P.A.**
800 Corporate Drive, Suite 500
Ft. Lauderdale, Florida 33334
Telephone: (954) 491-2000
Facsimile: (954) 491-2051

By:     s/ Michael W. Moskowitz_____
        MICHAEL W. MOSKOWITZ
        Florida Bar No. 254606
        Email: mmoskowitz@mmsslaw.com

        ARI J. GLAZER
        Florida Bar No. 194212
        Email: aglazer@mmsslaw.com

**KANNER & WHITELEY, LLC**
Allan Kanner, Esq.
a.kanner@kanner-law.com
La. Bar No. 20580
Cynthia St. Amant, Esq.
c.stamant@kanner-law.com
La. Bar No. 24439
701 Camp Street
New Orleans, Louisiana 70130
Telephone: (504) 524-5777
Facsimile: (504) 524-5763
*Pro Hac Vice to be filed*

**COMPLEX LAW GROUP, LLC**
David M. Cohen, Esq.
Ga. Bar No. 173503
dcohen@complexlaw.com
40 Powder Springs Street
Marietta, Georgia 30064
Telephone: (770) 200-3100
Facsimile: (770) 200-3101
*Pro Hac Vice* to be filed

Herschel M. Sigall, Esq.
Ohio Bar No. 0041728
190 West Johnstown Road
Gahanna, Ohio 43230
Tel: (614) 781-7686
Fax: (614) 781-7685
*Pro Hac Vice* to be filed
**Attorneys for Plaintiffs**